Before I begin, may I reserve four minutes for rebuttal? Yes. Aspirationally, you may. Thank you, Your Honor. May it please the Court. This case involves- Can you tell us who you are, just so I have a good record? I'm an old trial judge, so I like- Yes, Your Honor. Justin Smith for the Appellants, Arizona State Legislature, the Arizona State Treasurer, Mojave County, Fredonia, and the Colorado City. Go ahead. May I proceed? This case involves whether government bodies and officials can challenge former President Biden's creation of a 900,000-acre national monument in northern Arizona. There are three undisputed facts that demonstrate that appellants have standing to bring these claims. First, it is undisputed that the proclamation immediately prohibited certain mining activities that, up until that point, had been legal. Second, as it currently stands, the proclamation will be the only prohibition on all mining activities in January 2032. And third, every party in this case has at some point or another agreed that banning mining in these areas will cost revenue from the state and local governments. These undisputed facts demonstrate the three elements of standing that were required to plead at the motion to dismiss stage. The injury in fact, causation, and redressability. And therefore, the district court's decision should be reversed. Was there any mining that was happening that had to stop? Your Honor, the record shows that in 2012 there had been a withdrawal for certain mining activities for 20 years. The petition, the complaint alleges in paragraph 7 and paragraphs 193B, for example, that there would be a loss of revenue from the proclamation, both now and in the future. The record doesn't have any facts about what was taking place at that time because it was a motion to dismiss and that type of evidence isn't needed at the motion to dismiss stage. That's more what you would see at a summary judgment proceeding. Or had there been a factual challenge, then the plaintiffs would have been required to submit that evidence. But this wasn't... But given the withdrawal, is there an allegation that money was actually immediately ceased at the time that the proclamation happened? So the allegation is that there were mining activities that were allowed, like mineral and geothermal. Allowed, but actually happening? Is there an allegation that they were actually happening? There was not an allegation that it was happening on August of 2023, but that it was allowed between that time and going forward, that there was no prohibition from the 2012 withdrawal. And there was an allegation, for example, for Mojave County in that the proclamation would cost tax revenue from Mojave County. And so, again, because this was a facial challenge and not a factual challenge, that's all the plaintiffs needed to allege at that point. And the courthouse news service case by this court does a good job of distinguishing between a facial and a factual challenge. For the apologies to convert this into a factual challenge, they needed to submit affidavits or evidence to contest the allegations. And that wasn't done here. If you'll excuse me, I'm just going to interrupt you. Can you stop the clock for one sec? Do I have the plug here? I just don't want to dive under the desk here. But... Thank you. All right. You can proceed. I'm sorry. Thank you. So, I was just talking about how this is a facial challenge. And under Lujan, the fact that this is a facial challenge means three things. It means that all the allegations in the complaint are assumed to be true. It means that all those allegations are construed in the plaintiff's favor. And three, that any of the allegations are presumed to embrace the facts that would be needed to support those claims. So, are you familiar with the fact that the plaintiff's favor is assumed to be true? Are you familiar with the Arizona Alliance en banc case? Yes, Your Honor. Okay. I think I'm the only one of our panel that was actually on that. And we haven't actually issued an opinion. But are any of the.. But you obviously know that when we go en banc, we can revisit precedent of the Ninth Circuit on standing issues, meaning that are any of the.. You know, what cases are you relying on in the Ninth Circuit to give you standing? I'm just curious to see if that case might influence whether you have standing or not. Yes, Your Honor. So, I'd point to a few and I'll come back to that particular case in a minute. But Maya versus Syntax Corporation would be a good case from 2011 showing that we didn't need to plead the specific dollar amounts that were issued. The California Restaurant Association case from 2024 and the People for Public Lands cases are cases that show that we don't have to be specific in what types of minerals would be mined. But what about.. Are you relying on havens at all? We don't rely on havens. So, the case that you're referring that went en banc was actually.. The panel opinion was relied on by the district court for its opinion. And that was one of our allegations of error in this case was that there was a reliance on that decision in the diversion of resources analysis, which is our third standing argument. And that after the district court ruled, this court took the case en banc. And so, we've argued that that is a reason that this case should be remanded for the district court to revisit that issue after we get the en banc ruling. So, you're arguing back to this issue of whether there was mining revenue that was cut off. You're arguing that you have an allegation that revenue was lost and that that should just, I guess, be taken as true. But if an allegation is too speculative or implausible, it doesn't need to be taken as true. And if you are saying that there wasn't mining happening at the time, why isn't it implausible that there was revenue coming from mining that wasn't happening? Yeah. So, you're onto the question of immediate harm. I'd make three points. The first is one that I already made that it's undisputed that there's a difference between the proclamation and the 2012 withdrawal and what's affected. The second thing I'd point to is that the proclamation makes the national monument the dominant reservation for this area. So, currently, all mining is technically predominantly banned by the proclamation, not the 2012 withdrawal. And third, I would point out that the interveners below all talked about the immediate impacts that this monument was giving them. So, for example, there were 10 environmental groups that attempted to intervene. And they discussed that the proclamation immediately protects their interests by prohibiting certain activities and directing the creation of a new management plan. And so, the parties below, including the attempted interveners, all believe that this proclamation had immediate effect. But that alone is not all that we need to show or would be enough to support standing. I'd point to the certainly impending effect of the January 2032 date. And the district court improperly dismissed that based on a temporal proximity argument. So, the argument being that we just filed too soon. And that's wrong for a few reasons. The first is, unlike in Lujan, where a ticket needed to be purchased or a trip needed to be taken to go see crocodiles in Egypt or elephants in Sri Lanka, here we have a date certain of when the proclamation will be the only prohibition in the area, and that's January of 2032. We can point to a specific date on the calendar. That distinguishes this case from Lujan. Also, we pointed in our brief to a number of circuit court cases in which courts allowed cases to begin years before something took effect. So, I direct the court to the D.C. Circuit's decision in the village of Bensonville versus FAA. That was a case where the challenge was brought 13 years before a fee was collected by the city of Chicago. And there were other cases like Orangeburg versus FERC that was five years in advance. So, for your clients to be injured in this 2032 date in the future, there needs to be an economic incentive to do the mining at that point in time. How do we know that that will be true given the prices in 2032? So, I make three points today. I want to kind of expand on that so you can answer it all. Because one theory, if you're standing advanced by Mojave County, Colorado City, and the town of Fredonia relates to the lost tax revenue from uranium mining. Doesn't this argument depend on the price of uranium in 2032 and whether mining companies would be willing to mine uranium in 2032? So, how is that not too speculative to establish standing? So, can you sort of incorporate that with what Judge Friedland is asking you? Absolutely. So, I'll start broader and then make the three points I was going to make to Judge Friedland. So, broadly, last summer, the Supreme Court made a really important decision in diamond alternative energy. It involved the electric vehicle mandate in California. And that case was brought by fuel producers, not by industry. And the allegation was that this California mandate is requiring more electric cars and that, therefore, is creating market consequences of less gasoline purchase. And in a 7-2 decision, the Supreme Court said that that case had standing. And the two dissents were on whether the court should have taken cert anyway. And the opinion written by Justice Kavanaugh does a really good job of addressing your question, Judge Callahan, and Judge Friedland, as well, because it goes through and says the whole reason for that regulation was to have a market effect. That's why it was put in place. That's what California and EPA had said was the reason for it being in place. And here, we have that same type of evidence. The whole reason to issue a proclamation nine years before the withdrawal expired. We look at paragraph 160 of our complaint. President Biden explicitly said it was to ban mining in the area, and there were sources that talked to the New York Times and the Washington Post that said the same thing. We look at the interveners in this case that are referenced. The environmental groups, the tribal nations, the state of Arizona all said that we will lose protections and benefits if this proclamation is reversed. So all the parties here believed that the proclamation was needed to prevent that mining. And to the three points that I was going to direct to Judge Friedland, that is the first, that the parties and President Biden all said this is the purpose of the proclamation, and that's in diamond alternative energy, straight up the analysis that the court had. The second would be the interveners all saying that. We have in our briefs the specific citations to the environmental groups and the tribal nations and the state of  And then the third point is just the consistent history of elevated uranium prices. We talked about in our brief how for 246 of 249 months, the price had been higher than it was when hundreds of mining claims were being staked in that area. It's a very consistent pattern. So the court doesn't need to speculate. In the diamond alternative energy case, Justice Jackson complained that some of the data was based on 2011 figures, and yet the 7-2 court still went through that analysis and said that this is a market-affecting regulation, and so you can make common-sense inferences of what the economics would happen here. And here there's clearly a desire for uranium because it's much more expensive than it was 20 years ago. And so that's why we can't... Let me ask you, do either of my colleagues want to ask any additional questions, or may he reserve at this point? You can reserve the balance. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors, and may it please the court. Amy Collier on behalf of the federal defendants. I would like to start kind of where we left off with diamond energy and, you know, what's going to happen in 2032. And just to emphasize again, the distinction here is that the plaintiffs in this case are not themselves seeking to mine for uranium or undertake this economic activity at all. Instead, they're relying on speculation that several years from now, other entities, third parties, again, not before the court, will decide that, A, the price of uranium is high enough that we want to stake new mining claims, B, that we will stake those new mining claims rather than develop existing mining claims that are already still valid, existing rights that can still be developed in this mining area, that we'll choose those claims over mining elsewhere in the country, and that those mining activities would produce some sort of illusory revenue for these local governments. I think the appellants point to 21 years of uranium prices to demonstrate that the price of uranium in 2032 will be sufficiently high to attract mining companies and ultimately gain revenue from those companies. How do you respond to this evidence and how would we interpret it as part of our analysis? Sure. So I think, you know, the volatility in uranium prices is relevant, but I think, again, that's just one factor that these third parties, who, again, are not before the court, might consider in determining whether they will mine in this particular area, whether they will seek to develop existing mining claims that already exist and that could be developed, or whether they will take, you know, the risk of locating new mining claims in the monument area. So that's part of it. That's part of the equation that they might factor in, but it's not the only factor. And, again, it's not the plaintiffs here that are claiming that that is something that they would consider. And then, again, it's just part of the sequence that it's not even that we're challenging based on the revenue that the mining companies themselves could make, but some sort of speculative tax revenue that the local governments would make. And in their complaint themselves, they sort of, they acknowledge that there's, quote, only a chance that these new mining claims will be staked in 2032. So even... I think the appellants also alleged that the district court applied the incorrect pleading standard and argued that you do not defend against this claim. What is your response? Do you believe the district court applied the correct pleading standard or not? I do believe the district court applied the correct pleading standard. You can look at the district court's order and it repeatedly says that the plaintiffs failed to allege sufficient facts that would support their standing. Now, it did address that earlier case and the evidence that was presented in that case and said, you know, that had more evidence there, but it didn't say that the plaintiffs here needed to provide that evidence. It simply said that the plaintiffs did not allege the sort of facts that were alleged in the prior case. So throughout the district court's order, you can see that it's applying that allegation standard that is consistent with this court's jurisprudence. And we're on de novo review anyway, so in a sense, it doesn't matter? That's correct. And then I would like to touch a little bit more on diamond energy. So again, in that case, you had the fuel producers themselves challenging a regulation that was directly aimed at reducing the consumption of fuel. The Supreme Court noted that the California law was aimed specifically at doing that. Here, the monument proclamation does restrict new mining claims and restrict other mining activities, but the goal of the monument designation is not to reduce local revenue in any way. That's an additional step that they are alleging as a goal. Well, I think the appellants assert that the proclamation has an immediate impact related to certain conservation goals. Do you believe these asserted impacts are sufficient to establish harm for Article III standing? Why or why not? So in terms of other activities that they have alleged the proclamation does immediately affect, I think one of the examples of that is geothermal leasing. There are no allegations anywhere in the complaint that there have been interests in those activities, that there is prospective revenue coming in at all from those activities, and that there really are any injuries at all related to those activities. Now, the proclamation does do something. It does restrict those activities. That's not to say some plaintiff could challenge the proclamation based on certain economic injuries, but just these plaintiffs here have not alleged sufficient facts to show that they have suffered an injury from those sorts of  Can I go back to the third party? It's speculated because there are third parties who are involved here and whether they would actually do the mining. Is that the main problem or is the time to 2032 part of the  It seems like maybe your argument is really more the first and not the second. I think it's both. So I think the temporal aspect factors into sort of the uncertainty of what parties will do in the future. So for example, the cases that plaintiffs cite about, you know, the Bensonville case where the fee will go in effect in 13 years, the court was clear that that would go into effect unless the court acted, unless there was some new intervening action that would make it so it wouldn't go into effect. Here we have sort of speculation that sometime in the future, third parties will actively do something. And I think the temporal distance just adds to the speculation of what will be the context on the ground in 2032. And so it's an additional layer of speculation, additional uncertainty, additional indication that, you know, there may never actually be a concrete injury, a concrete conflict caused by the proclamation on these specific plaintiffs. So counsel, a question on that. If I recall correctly, there's no allegation in the complaint that, for example, there was an options contract, for example, let's say there was an options contract the state had negotiated that started in 2033 and continued for 10 years. Right. There's no allegation like that in this case. No, there is not. There is some speculation and plaintiffs themselves say there's a chance there might be new mining claims at that time. There's always a chance. Right. Dumb and dumber. But I mean, in terms of an actual contract or some economic interest that was voided by this proclamation by the president, we don't have a contract we can point to that was struck down. We don't. And I think we make note of this in our brief that, again, the proclamation preserves those valid existing rights. And since the proclamation has been issued, there was a mining claim, a valid existing right that has been developed and is now an active mine there that the local governments could obtain revenue from if they wanted to. That hasn't been caused to cease because of the proclamation itself. And then I do want to just quickly address the Havens case and just the diversion of resources argument. So in Hippocratic Medicine, the Supreme Court was very clear that Havens was an unusual case, that it was declining to extend Havens beyond that unique context. And I think to just point to the facts here, it's very clear that appellants are asking for an extension of Havens beyond its narrow context, partly because there's no case that they've identified where a government entity or local governments have successfully alleged a diversion of resources to create their standing based on some government action. That's an extension there. They're also not alleging any sort of interference with their core function. Instead, they're alleging that they might need to voluntarily change the content of what they're doing, voluntarily respond and coordinate with the federal government based on the proclamation itself. And so all of that would just be an extension of Havens at the Supreme Court. It was very clear that that should not occur. And just to step back a little bit again, the Supreme Court in U.S. versus Texas, this court in Washington versus the Food and Drug Administration has made clear that in the specific context where there are local governments or state governments in those contexts, but here I think local government is applicable too, where the governments are challenging some federal actions, indirect effect on their revenue, on their taxes, there must be some sort of more concrete connection between the federal action and the loss of revenue. Do you think we need to wait for Arizona Alliance to come out on the En Blanc Court before we rule on this? I don't think so, because I think, again, the district court was relying on Hippocratic medicine, which is binding Supreme Court precedent. And I don't think that this court... I thought we were on de novo review and it didn't matter. Well, I think we are, but I point to the appellant's point that the district court, you know, relied too heavily on the now vacated opinion. But again, you know, it's binding precedent on this court. I don't think this is a close question that this court would need to delineate the clear standard post-Hippocratic medicine for Havens-type cases, because this is a new context that I don't think really requires that sort of granular analysis. And so if there are no further questions from the court, my part. Thank you, Your Honor. Thank you. Good morning, Your Honors, and may it please the court. Alexander Samuels on behalf of the state of Arizona. I recognize that the different plaintiffs here articulate slightly different types of harms, but one thing I want to make sure doesn't get lost is the unique types of harms that the legislature has attempted to assert here in its attempt to manufacture standing. And I bring it up not only because of the impact on this case, but because of the potential impact on other cases if those novel theories were accepted. In trying to manufacture standing here, the legislature proffers theories that I think would open the courthouse doors to a whole new group of different types of cases, and in particular, those cases are very likely to be politically charged, and exactly the types of cases where courts like this one are understandably skeptical of expanding the strict requirements of Article III standing. At bottom, legislative standing is a rare thing. It requires a legislature to articulate that a power has been taken away or that a specific action has been nullified, and the legislature doesn't get anywhere close to articulating those things here. Is there any legal basis under Arizona law that would allow the treasurer of the state to file a lawsuit to redress a harm suffered by the state of Arizona? No, Your Honor. I mean, Arizona law is clear, and this is 41-193 in the Arizona revised statutes, that it is the attorney general who represents the state here in federal court. And it's not the legislature, it's not the treasurer, it is the attorney general. Now, state agencies— But sorry, maybe I misunderstood Judge Calhoun's question, but I thought she was asking, could anyone sue if the state was losing revenue? Is your answer that the attorney general could? Oh, yes. I mean, certainly if the state is being harmed, the state can  I think that's a pretty easy question to answer, but the question is, who can sue on behalf of the state? The attorney general represents the state in those cases. You also might have cases where state agencies or state actors are injured themselves and can sue in their own right. So, for example, here, the state land department is directly impacted, and the legislature, I think, is quite clear about the fact that they perceive harms to the state land department, and that underlies a lot of their claims. But that means the state land department could perhaps come and sue on behalf of themselves, not that the legislature can repackage those harms. And frankly, they're, I think, pretty transparent about that. If you look at—this is subsection H of paragraph 191 of their complaint. They say, the administration charge in control of state land is vested in the state land department. However, there is much reason to believe that the department will not seek to stop the unlawful proclamation. Well, I mean, they're right about that. The state land department is not seeking to stop the unlawful proclamation. Indeed, the state and the governor who oversees the executive branch are here telling you that they don't perceive there to be harms. So I think the appellants rely heavily on a theory that the proclamation interferes with their ability to manage and dispose of state trust land. As the state of Arizona, what is your view as to how the proclamation affects the state trust land at issue here? So, and I think that ties into just what I was getting at, which is both the state here and the governor here have intervened on the other side of the V and are here telling you that they don't perceive the harms that the legislature perceives or says that they perceive in their complaint. I mean, certainly, could there be some impacts on state trust land here? I'm sure there could be. Some of those impacts could be positive, quite frankly. I think, you know, one of the other plaintiffs below, the Heaton plaintiff who chose not to appeal, talked about how he was worried there might be increased tourism in the area. That may increase the value of some state trust land. I mean, the picture that the plaintiffs paint here, it's just much more complicated than that. And the state and the governor are here telling you that they don't perceive the harms that the legislature says that they  Bottom line, for your purposes, is that those just aren't the legislature's harms to allege. The legislature can only allege certain harms to themselves, and that's not the type of harm they've alleged here. I do want to also touch on the other plaintiffs here, because while I think the legislature is really important, I recognize some of the questions here have gone to some of the other plaintiffs, like the potential tax loss that the county, the city's allege. I do think it is speculation piled on top of speculation. It's certainly nowhere close to certainly impending, which is the standard the U.S. Supreme Court has imposed. I would encourage the court to go look at the Grand Canyon Trust case, which details the one mine in these areas that actually has operated at times, and that's because their rights accrued at a time where they actually have retained the right to operate. And as it's detailed in that Grand Canyon Trust case, they say, you know, things got rolling there in the 80s, but activity ceased in 1992 because uranium prices dropped. Now, interest, you know, that case details interest in the mid-2000s started to spike again because uranium prices started to spike again. But, you know, the 21 years of history that we cited here, they didn't pick 21 years at random. It's that that's when uranium prices started to spike again. And in the decade plus previous to that, you had someone who could have been doing uranium mining in the area and choosing not to. And you may very well have companies making those exact types of choices in 2032. There's just no way for a court sitting here now to know. So your time is up, but there was a little time left over from how much time was left over? I'm happy to use 37 seconds. You were spot on. You're 37 seconds over, and you used the other 30 seconds. So that's amazing. Unless my colleagues have any questions. Thank you. Thank you. May it please the court? Yes. Justin Smith again for the appellants. I'd like to talk and begin about speculation and the role of third parties. So we cited in our brief two places where the federal government and the state of Arizona have both said that if there's a mining ban in this area, it will cost, you know, $180 million in revenue to the state and local governments. That's page five of the amicus brief that the state of Arizona joined in the National Mining Association case before this court in April of 2015. That brief relies on five different tables put in the final environmental impact statement produced by the federal government. And the federal government made admissions in the Yount versus Salazar case in document 84 that there would be harm to Mojave County in the form of reduced tax revenue. The local governments have a proprietary interest in that tax revenue. They don't need to demonstrate an options contract that would place after 2032 because the city of Sausalito shows that there's a proprietary interest that the cities and counties can protect in the form of the lost tax revenue. The Douglas County case also talked about how there's an interest that counties have and how neighboring federal land is  The third parties before the court was an issue in the diamond alternative energy case. Again, as we discussed earlier, it was the fuel producers that brought that. They're actually industry that intervened on the side of EPA in that case. And the theory was the electric vehicle market has changed such that even with or without this regulation that people will still be choosing to buy electric vehicles and there won't be more gasoline produced if this regulation is removed. And it was a redressability argument similar to what we hear here. But the court rejected that because they said the whole point of having a market affecting regulation is to, in fact, affect that market. And you can presume and operate as a court with removing that market regulation will remove the impact on the market. And so that analysis from diamond alternative energy directly applies here to say that case was immediate, though, right? There wasn't this. We have to think about what might happen many years in the future. And like I said, Justice Jackson talks about how the data in that case was based on 2011 studies. And I believe she also made the argument that there was a different regulation that California had put in place that also might have some impact. And yet the court said that the whole reason the government is defending that regulation is because they think it will have some effect. And here DOJ and the state are defending this proclamation. It was put in place because it was anticipated that it would be needed, that it would have some effect in 2032. One of the things the state just said is there could be increased tourism. How do we know that the county, the local governments will lose revenue instead of gaining revenue? So the court doesn't have to get into that type of analysis. That's not part of the standing. The city of Oakland case from 2015, there was a medical marijuana dispensary that was being shut down. The federal government made that exact same argument that said, well, sales are going to be dispersed throughout the city of Oakland, so you're not going to actually lose revenue. And the court said you don't get into that analysis. You look at here, you have a dispensary that's being shut down, and the city of Oakland could show that there was tax revenue that would be lost from that dispensary, and therefore standing applied, and that same reasoning applies here. In the remaining seconds, I'd just like to point out there is an issue with the incorrect pleading standard that was applied because the court faulted the appellants for not updating the economic projections. That's at 1 ER 24. Again, though, because we're on de novo review, isn't our job just to look at the complaint and see if it has standing and not worry about what the district court said? Yeah, and I think that's exactly right, Judge Friedland, that de novo review would do that. I think this is just an example of how the court should approach that de novo review and see that the economic projections that the appellants alleged in paragraph 181 of 29 billion and in the affidavits that we attached in exhibit A and B, paragraphs 27 and 36 of exhibit A and paragraph 7 of exhibit B, provide that evidence that was overlooked by the district court and that this court should review at the de novo stage. Any additional questions? All right. That this matter will stand submitted. Thank you, all parties, for your helpful argument in this matter.
judges: CALLAHAN, OWENS, FRIEDLAND